IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

FRANCIS GODWIN, )
)
    Plaintiff, ) CASE NO. 2:09-0106
) JUDGE HAYNES
v. )
)
ELCTROLUX HOME PRODUCTS, INC., )
et al., )
)
    Defendants. )

## MEMORANDUM

Plaintiff, Francis Goodwin, a Tennessee citizen, originally filed this action in the Circuit Court for Cumberland County against the Defendants: Electrolux Home Products, Inc. and Lowe's Home Centers, Inc. Plaintiff asserts claims under the Tennessee Products Liability Act, Tenn. Code Ann. § 29-28-104, et seq., arising out of a fire from a defective stove that destroyed her home. Plaintiff attributes the cause of the fire to the malfunction of the stove's motor for cleaning that Defendant Electrolux manufactured. Plaintiff purchased this stove at a Lowe's facility. The Defendants, foreign corporations, removed this action to this Court, citing diversity jurisdiction under 28 U.S.C. § 1332. Plaintiffs did not object to the removal, and the parties proceeded with discovery of their claims.

Before the Court are eight motions[1], but this Memorandum addresses only two: (1) Defendants' motion for summary judgment (Docket Entry No. 38); and (2) Defendants' motion to exclude the testimony of Plaintiff's experts (Docket Entry No. 41). Although these motions

---

[1] The other motions will be addressed separately.

1

involve different subjects, the issues in these motions are interrelated. In a word, for Plaintiff's claims, Tennessee law requires expert testimony on the element of causation.

## A.  Review of the Record[2]

Plaintiff purchased the Electrolux stove for cooking at a Lowe's store in Crossville, Tennessee in 2006. The stove was a Frigidaire brand stove model number FEF 352 AWE, and serial number VF 32532353, that Electrolux manufactured in 2003 at its Springfield, Tennessee facility. At that facility, the stove was also tested for performance. The stove has a serial tag that reflects the testing and Electrolux's approval. This oven has four top burners and an interior oven with an automatic cleaning mechanism. The oven's self-cleaning function is of particular note here. The parties dispute how this self-cleaning process is initiated, but there is a cleaning button on the top of the stove, and an arrow to identify the length of the cleaning cycle. When the self-cleaning function is initiated, the stove's latch motor is energized.

Aside from Plaintiff's purchase, the parties dispute whether the Electrolux stove at issue was in a sealed container, and whether Plaintiff was actually provided with the Lowe's sales receipt with a disclaimer of warranties. (See Docket Entry No. 49 at ¶¶ 5, 6, and 7). Defendants produced a sales receipt that reflects a disclaimer of implied warranties of merchantability and fitness for a particular purpose. Id. at ¶ 8. These disclaimers are on the back of the Lowe's sales receipt. The Electrolux stove's use and care manual contains provisions that exclude recovery of

---

[2] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). The Court concludes that there are numerous material factual disputes. Thus, this section does not constitute finding of facts under Fed.R.Civ.P. 56(d).

consequential or incidental damages, including property damage and incidental expenses in the event of a breach of any express or implied warranty for the stove.

According to Plaintiff's daughter Joy Schienost, on May 4, 2006, more than two weeks prior to the fire, Schienost pushed the stove's clean button and then pushed the stove panel's down arrow to select a cleaning cycle of one hour. (Docket Entry No. 42-3, Joy Schienost Deposition at 58). After selecting the one hour cleaning cycle, Schienost observed the stove's interior light activate and heard the oven's door lock. Id. at 60. At that point, the oven emitted a beeping noise, and the oven's panel screen flashed the letter "E". Id. This beeping lasted approximately one hour, and after another 30 minutes, Schienost was able to unlock the oven door. Schienost then attempted to use the self-cleaning function a second time using the same process, but the oven door would not unlock. Id. at 61. Defendants assert that Schienost's May 4th cleaning was her only attempt to operate the oven's self-cleaning function, id. at 6, 20-21, and neither the Plaintiff nor her granddaughter ever attempted to operate the self-cleaning function of the stove prior to the fire. (Docket Entry No. 42-2, Goodwin Deposition at 65, 104; Docket Entry No. 42-4, Jacqueline Schienost Deposition at 20-21, 24-25).

On May 5, 2006, Schienost and her mother traveled to Washington, D.C., but before leaving, Schienost checked the oven where the internal light remained illuminated and the oven door remained locked. When Plaintiff and her daughter returned on May 19th at approximately 11 p.m., the oven light was off and Schienost was able to open the oven door. At that point, Schienost placed a broiler pan and an iron skillet inside the stove. According to Plaintiff, the stove was not used on the night of May 19, 2006. Defendants note that at the time of the fire, several pots and pans were inside the oven. (Docket Entry No. 49 at ¶ 28).

3

On May 20, 2006, a fire occurred at Plaintiff's home that began at the stove and moved to other parts of the residence, causing the loss of Plaintiff's home. According to Plaintiff, on the morning of the fire, Plaintiff, her daughter and granddaughter left the residence, but none of them had used the oven or the range that morning. After various stops, they returned to Plaintiff's home on May 20th at approximately 5:00 p.m. Later that evening after they went to bed, Joy Schienost, Plaintiff's daughter, experienced heat under her right foot, and the floor underneath her began to buckle. Upon opening her bedroom door, Joy Schienost smelled smoke and saw a bright light coming from the kitchen. Schienost told her daughter to get the fire extinguisher and to spray the kitchen area while she called the fire department. According to Plaintiff, on the day of the fire, neither the Plaintiff, nor her daughter, nor her granddaughter used the stove or cooked anything in the oven.

A dispute arises as to the timing of the fire alarm at Plaintiff's residence. According to Plaintiff, the fire alarm occurred at approximately 5:35 p.m., to which two different fire departments responded. (Docket Entry Number 49, Plaintiff's Responses to Defendant's Statement of Material Facts at ¶ 2). The fire department report for the Cumberland County Fire Department reflects that the fire alarm sounded at 7:11 p.m., Jay Schienost, Plaintiff's daughter, places the fire starting between 5:30 and 5:45 p.m.

Defendant cites the testimony of Jimmy Barnes, a volunteer firefighter for the Cumberland County Fire Department, who responded to the fire. Plaintiff allegedly stated that she had cooked dinner on the stove a couple of hours before the fire and had left some pots and pans on the stove top. Barnes testified that there were pots and pans on the top of the range, and that one of the stove's top knobs had been left in the "on" position. The Cumberland County Fire Department concluded that the fire "started from something left unattended on the range."

4

After the destruction of Plaintiff's home, Plaintiff's insurer sent Phillip Gentry, a certified fire and explosive investigator, to conduct an investigation. Gentry attributed the origin of the fire to the interior of the Electrolux stove, and specifically excluded cooking as the cause of the fire. The bases for Gentry's opinions were burn patterns and a small motor inside the stove that had heavy damage with its aluminum coating burned off. In addition, the insulation of the electrical wiring in the stove was also ignited and burned. According to Gentry, the motor and its wire had a higher degree of heat than other portions of the stove. Gentry, however, recommended a chemical engineer investigate the fire further.

Plaintiff retained R. J. Hill, a mechanical engineer, as to the cause of the fire. Hill, who has testified as an expert in several state cases, opined that the fire was not caused by cooking, but that the motor for the self-cleaning function of the oven overheated and caused combustible material such as insulation on the wiring to ignite, causing the fire. A burn pattern was present at the rear of the stove that suggested to Hill a progression of heat toward the left side and pointed to the electric motor. Hill also noted the burn pattern on the inside surface of the stove top. In his interview, Plaintiff told Hill that she had trouble with the self-cleaning feature of the oven and that the oven door would sometimes lock and not unlock. Plaintiff told Hill that she had used the self-cleaning feature approximately two months prior to the fire. Defendants note that Hill's examination of the stove on June 5, 2006 reflected that the control panel was almost completely destroyed, and that the damage had further advanced on the right side.

### B. Conclusions of Law

In a diversity action, the district court is obliged to apply the law of the forum, Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938) as well as the conflict of law principles of the forum to determine which state's substantive law shall apply. Klaxton Co. v. Stentor Elec. Mfg., 313 U.S.

5

487 (1941). Under Tennessee law for tort claims, a court applies the law of the state with the more significant relationship to the occurrence. Hataway v. McKinley, 830 S.W.2d 53, 59 (Tenn. 1992). Here, the parties agree that Tennessee law governs Plaintiffs' claims because the sale of the stove and the fire at issue occurred in Tennessee.

Plaintiff asserts two theories of recovery, defective and dangerous product and the consumer expectation test, under the Tennessee Product Liability Act of 1977, Tenn. Code Ann. §§ 29-28-101, et seq.[3] In Higgs v. General Motors Corp., 655 F. Supp. 22 (E.D. Tenn. 1985), aff'd sub nom, Thomas v. Subaru of America, 815 F.2d 80 (6th Cir. 1987), the Honorable James H. Jarvis, District Judge, summarized the threshold requirements for all claims under the TPLA:

> Indeed, it makes no difference whether the complaint is couched in terms of negligence, strict liability or breach of warranty; it has generally been held in the state of Tennessee that in order for a plaintiff to recover under any theory of product liability, the plaintiff must establish that the product was defective [or] unreasonably dangerous at the time the product left the control of the manufacturer.

655 F. Supp. at 23 (citation omitted) emphasis added). See also Tenn. Code Ann. § 29-28-105(a) ("A manufacturer or seller of the product shall not be liable for any injury to person or property

---

[3] Section 29-28-102(6) defines "product liability" to include all of Plaintiffs' claims:

> 'Product liability action' for purposes of this chapter shall include all actions brought for or on account of personal injury, death or property damages caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product. It shall include, but not be limited to, all actions based upon the following theories: strict liability in tort; negligence; breach of warranty; duty to warn or instruct, whether negligent or innocent; misrepresentation, concealment, or nondisclosure, whether negligent or innocent; or under any other substantive legal theory in tort or contract whatsoever.

Tenn. Code Ann. § 29-28-102(6) (emphasis added).

caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.").

There are statutory definitions for "defective condition" of products and "unreasonably dangerous" products under the TPLA. "'Defective condition' means a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. § 29-28-102(2).

> 'Unreasonably dangerous' means that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller assuming that he knew of its dangerous condition.

Tenn. Code Ann. § 29-28-102(8). To meet this statutory standard, "[i]t is necessary for the plaintiff to establish that the product was unreasonably dangerous or that the design was defective in some fashion, and that the defect was the proximate cause of the accident." Cordell v. Ward School Bus Mfg., Inc., 597 S.W.2d 323, 325 (Tenn. Ct. App. 1980) (emphasis added).

Under Tennessee law, a design defect is not established merely because there may have been a better design which would have prevented the injury:

> A manufacturer is not an insurer of the product he designs, and it is not required that the design adopted be perfect, or render the product accident proof, or incapable of causing injury, nor is it necessary to incorporate the ultimate safety features in the product. Hence, a departure from the required standard of care is not demonstrated where it is simply shown that there was a better, safer or different design which would have averted the injury.

Kerley v. Stanley Works, 553 S.W.2d 80, 84 (Tenn. Ct. App. 1977).

Tennessee courts have noted in a TPLA action that "[a] defective design may be proven by testimony of an expert who either opines as to the product's design or has inspected the

product." Cox v. General Motors Corp., 1996 WL 266649, at *2 (Tenn. Ct. App. 1996) (emphasis added). Accord Whaley v. Rheem Mfg. Co., 900 S.W.2d 296, 299 (Tenn. Ct. App. 1995). Yet, in King v. Danek Medical, Inc., 37 S.W.3d 429, 435 (Tenn. Ct. App. 2000), the Tennessee Court of Appeals ruled that "it does not mean ipso facto that a device is defective because a screw becomes loose."

Under Tennessee law, a defect in a product may be proved by direct evidence, circumstantial evidence, or both. Browder v. Pettigrew, 541 S.W.2d 402, 405 (Tenn. 1976). For example, "circumstantial evidence, such as proof of proper use, handling or operation of the product and the nature of the malfunction, may be enough to satisfy the requirement that something was wrong with it." Id. at 406 (quoting Scanlon v. General Motors Corp., 326 A.2d 673, 677 (N.J. 1974)). In addition, a plaintiff also has the burden of showing proximate cause, i.e., that the "alleged defect in the product [was] the cause in fact of the injury." Wyatt v. Winnebago Indus., Inc., 566 S.W.2d 276, 280-81 (Tenn. Ct. App. 1977).

Yet, expert testimony is necessary to establish liability in cases involving manufacturing and design defects. Browder, 541 S.W.2d at 404; Fulton v. Pfizer Hosp. Prod. Group, Inc., 872 S.W.2d 908, 912 (Tenn. Ct. App. 1993). Under Tennessee law, "[t]he issue of whether a product is defective or dangerous is one for the jury," Whaley v. Rheem Mfg. Co., 900 S.W.2d 296, 300 (Tenn. Ct. App. 1995) (citation omitted), but a court may properly grant summary judgment where admissible expert testimony on causation and product defect is lacking. Pride v. BIC Corp., 218 F.3d 566, 580 (6th Cir. 2000).

Here, the pending motions focus on the Plaintiff's expert proof that is challenged as to its admissibility under federal law and its probative value under Tennessee law.

The pertinent Federal Rules of Evidence on the admission of expert testimony provide as follows:

> Rule 702. Testimony by Experts
>
> If scientific, technical, or other special knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
>
> Rule 703. Bases of Opinion Testimony by Experts
>
> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted....
>
> Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion or Waste of Time.
>
> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 702, 703, 403.

"To qualify as an expert under Rule 702, a witness must first establish his expertise by reference to knowledge, skill, experience, training, or education." Pride, 218 F.3d at 577. While a person may be qualified as an expert, his testimony may still be inadmissible if the methodology "employed by the expert in analyzing the data obtained in the visual inspection, and the scientific basis, if any, for such an analysis" is unreliable. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 153, 1167, 143 L. Ed. 2d 238 (1999). A district court is not required to conduct an evidentiary hearing to qualify an expert witness under Daubert. Clay v. Ford Motor Co., 215 F.3d 663, 667 (6th Cir. 2000), cert. denied, 531 U.S. 1044 (2000).

9

Here, the Court concludes that Hill possesses sufficient knowledge, skill, experience, training and education as an engineer to qualify as an expert. Further, Hill has been certified as an expert in other cases and has prior experiences in investigating the origins of product fires.

As to the admissibility of Hill's opinions, under Federal Rule of Evidence 104(a), the Court must make a threshold determination whether the expert's opinion should be admitted. The Sixth Circuit has stated that "close judicial analysis of such technical and specialized matter is necessary not only because the likelihood of juror misunderstanding, but also because expert witnesses are not necessarily always unbiased scientists. They are paid by one side for their testimony." Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349, 1352-53 (6th Cir. 1992). "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible...." Viterbo v. Dow Chemical Co., 826 F.2d 420, 422 (5th Cir. 1987) (citations omitted); Robinson v. Union Carbide Corp., 805 F. Supp. 514, 523 (E.D. Tenn. 1991).

The Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), imposed a gate–keeping function on the district courts to ensure that expert testimony was based on scientific knowledge. Id. at 597. Daubert requires that "[i]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method, *i.e.*, 'a grounding in the methods and procedures of science [that] connote more than subjective belief or unsupported speculation' and that 'apply to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" Id. at 590 (quoting Webster's Third New International Dictionary 1252 (1986)). In short, the requirement that an expert's testimony pertain to "scientific knowledge" ensures a standard of evidentiary reliability. Id. In a footnote, the Court emphasized that "our reference here is to evidentiary reliability--that is,

10

trustworthiness." Id. at n.9. Later, the Court noted that "[t]he focus, of course, must be solely upon principles and methodology, not only the conclusions they generate." Daubert, 509 U.S. at 595. In Kumho Tire, the Supreme Court later expanded the district court's gate-keeping obligation under Fed. R. Evid. 702, and applied Daubert factors to all expert testimony, including persons with specialized knowledge. 526 U.S. at 150.

In Daubert, the Court listed the following factors for consideration of whether the opinion testimony involves scientific knowledge:

- Whether [the theory or technique] can be (and has been) tested.
- Whether the theory or technique has been subjected to peer review and publication.
- In the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error.
- Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community...may properly be viewed with skepticism.

Id. at 593-94.

Another consideration is the "fit" or "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Id. at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (3rd Cir. 1985)); see also United States v. Bonds, 12 F.3d 540, 558 (6th Cir. 1993).

The Sixth Circuit has provided additional guidance as to the application of Rule 702. For example, it is established that the plaintiffs bear the burden of showing the sound engineering basis for Hill's conclusions:

> The party seeking to have the testimony admitted bears the burden of showing 'that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology.'

11

Smelser v. Norfork Southern Ry. Co., 105 F.3d 299, 303 (6th Cir. 1987) (emphasis added and citation omitted).

As this Court has noted, there are additional questions and factors that can be asked on evaluating expert testimony:

> (5) Are the underlying data untrustworthy for hearsay or other reasons? (6) Does the underlying data exclude other causes to a reasonable confidence level? (7) What do the leading professional societies say about this specialty or this type of testimony? (8) How much of the technique is based on the subjective analysis or interpretation of the alleged 'expert'? (9) The judge's experience and common sense.

Hein v. Merck & Co., 868 F. Supp. 230, 231 (M.D. Tenn. 1994). The Ninth Circuit in the remand of Daubert added yet another factor--whether the expert's opinion is a product of independent research or whether the opinion was formulated for the litigation. Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir.), cert. denied, 116 S. Ct. 189 (1985).

Daubert and Kumho Tire require evidence that the methodology underlying the expert's conclusion is "supported by appropriate validation - - i.e., 'good grounds.'" Daubert, 509 U.S. at 590. "Good grounds" is determined, in part, by testing data for "feasibility." Id. at 593 (stating that the valid scientific methodology usually involves "generating hypothesis and testing them to see if they can be falsified").

The Defendants' motions focus on the Plaintiff's expert's failure to conduct additional tests of the wiring and motor to prove the oven's motor as the cause of the fire. As to origin of a fire, engineers have been allowed to opine about the origin of a fired based upon burn patterns. Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054, 1059 (8th Cir. 2005). In Fireman's Fund, the Eighth Circuit excluded testimony regarding an engineer's opinion about

12

the origin of a fire for failure to conduct tests, but the Eighth Circuit later clarified in Shuck v. CNH America, LLC, 498 F.3d 868, 875 n.3 (8th Cir. 2007), that "Fireman's Fund does not stand for a bright line rule that expert opinion in fire cases always must be supported by testing to be admissible. Rather, Fireman's Fund stands for the more general proposition that testing, if performed, must be appropriate in the circumstances and must actually prove what the expert claims it proves." Hill's examination and opinions about the fire are based upon burn patterns and this burn pattern analysis appears to be a legitimate method to determine the origin of a fire under Daubert.

As to additional testing beyond the fire burn patters, courts vary on exclusion of expert testimony as to the origin of a fire without testing and sampling. See Travelers Indemnity Company v. Industrial Paper and Packaging Corp., 2006 WL 1788967 (E.D. Tenn. June 27, 2006); Workman v. AB Electrolux Corporation, 2005 WL 1896246 (D. Kan. Aug. 8, 2005); and Kentucky Farm Bureau Mutual Insurance Company v. General Electric Company, 2011 WL 665747 (W.D. Ky. Feb. 15, 2011). As the latter court observed, an expert's "failure to conduct tests on the exemplar dryer is an issue of weight, not admissibility. 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, are the traditional and appropriate means of attacking shaky but admissible evidence.'" Id. at *3 (quoting Daubert, 509 U.S. at 596).

The Court concludes that Defendants' challenges to Hill's opinions go to the weight of those opinions, not their admissibility. The Court concludes that Hill's testimony, if accepted by the jury, could support a judgment on Plaintiff's claims under the TPLA. With the admissibility of these opinions, Tennessee law requires that the cause of the fire be decided by a jury.

Plaintiff's second theory under the TPLA is the consumer expectation test for whether a product is unreasonably dangerous, citing Jackson v. General Motors Corp., 60 S.W.3d 800 (Tenn. 2001). In Jackson, the Tennessee Supreme Court responded to the Sixth Circuit's request for a ruling on the following questions of Tennessee law:

> In a products liability action under Tennessee law, may the plaintiff use the "consumer expectation test" to prove that his seatbelt/restraint system was unreasonably dangerous because it failed to conform to the safety standards expected by an ordinary consumer under the circumstances?
>
> We accepted certification of this question, and, for the following reasons, conclude that the consumer expectation test may be employed in any products liability action under Tennessee law whereupon the plaintiff seeks to recover on the basis that the product is unreasonably dangerous.

\* \* \*

> We previously considered this statute and the consumer expectation test in Ray ex rel. Holman v. BIC Corp., 925 S.W.2d 527 (Tenn. 1996). In BIC, this Court, answering a Rule 23 certified question of law from the Sixth Circuit, examined the Tennessee Products Liability Act of 1978 to determine whether, in addition to the consumer expectation test, section 29-28-102(8) provided for a "risk-utility" test. We held that the statute provided for two tests: the consumer expectation test and the prudent manufacturer test (which involves risk-utility balancing). The plaintiff in BIC asserted that a disposable cigarette lighter was unreasonably dangerous on the basis of the prudent manufacturer test. In resolving this issue, the Court examined both tests under the definition of unreasonably dangerous, and concluded that "[o]ur statute does not limit the application of either test to only certain types of actions. Nonetheless, the consumer expectation test will be inapplicable, by definition, to certain products about which an ordinary consumer can have no expectation." 925 S.W.2d at 533.

\* \* \*

> For example, ordinary consumers would have a basis for expectations about the safety of a can opener or coffee pot, but, perhaps, not about the safety of a fuel-injection engine or an air bag.... While the statute does not limit applicability of the tests, the prudent manufacturer test will often be the only appropriate means for establishing the unreasonable dangerousness of a complex product about which an ordinary consumer has no reasonable expectation.

\* \* \*

14

**Absent contrary indication in the statute, we read Tennessee products liability law to permit application of the consumer expectation test in all products liability cases in which a party intends to establish that a product is unreasonably dangerous. It does not follow that, because the consumer expectation test may be applied in all such product liability cases, the manufacturer will be subject to absolute liability. Whether a plaintiff is successful on a products liability claim under the consumer expectation test will depend on whether the trier of fact agrees that the plaintiff's expectation of product performance constituted the reasonable expectation of the ordinary consumer having ordinary knowledge of the product's characteristics.**

**We are unwilling to accept the defendant's argument that ordinary consumers cannot form expectations about the safety and performance of seat belts.** The language in BIC upon which the defendant relies merely explains that it may be difficult for a plaintiff to establish that the product is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics," if the community has no ordinary knowledge about the product's characteristics. See Tenn.Code Ann. § 29-28-102(8). **Our intent in BIC was not to limit the application of either test, but to hold that, in order to be successful under the consumer expectation test, the plaintiff must present evidence that the ordinary consumer has an expectation regarding the safety of the product. "What is determinative is what an ordinary purchaser would have expected."** 925 S.W.2d at 531. The opinion in BIC clearly states that either the consumer expectation test or the prudent manufacturer test, or both, may be applied in all cases where the product is alleged to be unreasonably dangerous.

\* \* \*

The ability to go forward on a claim that a product is unreasonably dangerous based on the consumer expectation test requires that the plaintiff provide sufficient evidence to create a question of fact that the product was "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." See Tenn.Code Ann. § 29-28-102(8). **Once this question of fact is established, however, "[t]he general rule in Tennessee is that the issue of whether a product is defective or unreasonably dangerous is one for the jury,"** Curtis v. Universal Match Corp., Inc., 778 F. Supp. 1421, 1427 (E.D.Tenn.1991). Under the consumer expectation test, "a plaintiff is required to produce evidence of the objective conditions of the product as to which the jury is to employ its own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence." Arnold v. Dow Chemical Co., 91 Cal. App. 4th 698, 110 Cal. Rptr. 2d 722, 737 (2001).

Id. at 803, 804, 805.

Plaintiff also cites Donegal Mut. Ins. Co. v. White Consol. Industries, 852 N.E.2d 215 (Ohio Ct. App. 2006), where the Ohio appellate court applied the consumer expectation test to a Frigidaire (Electrolux) stove where plaintiffs' home was destroyed by a fire and attempt to engage the oven's self-cleaning feature. The Ohio Court of Appeals reinstated the jury verdict, concluding that:

> Plaintiffs presented evidence of unsafe, unexpected product performance when they alleged that Susan Nearon merely set the electric stove to self-clean mode before it acted defectively and caused the fire that destroyed the Nearons' residence. This is sufficient evidence from which a trier of fact may infer the existence of a product defect.

Id. at 221.

This Ohio decision supports this Court's conclusion that under Jackson, Plaintiff's proof on her consumer expectation claim may also support a judgment. Given the material factual disputes as to the circumstances surrounding the sale of the oven, the Court concludes that Defendants' motion for summary judgment should be denied.

Thus, the Defendants' motion for summary judgment (Docket Entry No. 38) and motion to strike Plaintiff's expert proof (Docket Entry No. 41) should be denied.

An appropriate Order is filed herewith.

ENTERED this the ___ day of April, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge